Walter Engelhardt,

      Plaintiff,

v.

Qwest Corporation, a foreign
corporation and Tim Buchholz,

      Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 15-4591 ADM/SER

---

Charles A. Delbridge, Esq., Nichols Kaster, PLLP, Minneapolis, MN, on behalf of Plaintiff.

Thomas J. Conley, Esq., Law Office of Thomas J. Conley, Minneapolis, MN, on behalf of Defendants.

---

## I. INTRODUCTION

On March 7, 2017, the undersigned United States District Judge heard oral argument on Defendants Qwest Corporation d/b/a CenturyLink, Inc. ("CenturyLink"),[1] and Tim Buchholz's ("Buchholz") (together with CenturyLink, "Defendants") Motion for Summary Judgment [Docket No. 18]. Plaintiff Walter Engelhardt ("Engelhardt") alleges Defendants terminated his employment as a contract technician for CenturyLink in retaliation for his involvement in a class action lawsuit against CenturyLink. Engelhardt asserts a claim against Defendants for retaliation under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq.; a claim against CenturyLink for a violation of the Minnesota Whistleblower Act ("MWA"), Minn. Stat.

---

[1] Qwest merged with and became a subsidiary of CenturyLink, Inc. in 2011. For consistency, the Court will refer to the corporate defendant as "CenturyLink," when discussing both pre- and post-merger events.

§ 181.931 et seq.; and a claim against Buchholz for tortious interference with prospective business relations. First Am. Compl. [Docket No. 14] ¶¶ 30–51. For the reasons set forth below, Defendants' motion for summary judgment is granted.

## II. BACKGROUND

### A. Parties

CenturyLink is a Colorado corporation with a registered office in Minneapolis, Minnesota. Id. at ¶¶ 3, 7. Defendant Buchholz is an operations director at CenturyLink. Buchholz Decl. [Docket No. 20] ¶ 1; Delbridge Decl. [Docket No. 27] Ex. 3 ("Buchholz Dep.") 17:21–24. In this role, he oversees approximately 325 employee technicians and 35 to 50 contract technicians. Buchholz Dep. 19:17–24.

Plaintiff Engelhardt is a Wisconsin resident who began working as a CenturyLink employee in 2000 as an installation and maintenance technician. First Am. Compl. ¶ 6; Delbridge Decl. Ex. 1 ("Engelhardt Dep.") 18:14–19:2. In 2007, Engelhardt was one of over 300 employee technicians who joined a class action suit against CenturyLink (the "Brennan Lawsuit") alleging that CenturyLink's "quality jobs per day" ("QJD") performance metric violated the FLSA. Engelhardt Dep. 11:15–12:3; Brennan v. Qwest Commc'ns Int'l, Inc., No. 07-2024 ADM/JSM (D. Minn. 2007). In 2008, CenturyLink terminated Engelhardt for low productivity because he was not completing enough quality repair jobs each day. Id. 13:15–25. The Brennan Lawsuit settled in 2011. Engelhardt received a settlement payment as a class member. Engelhardt Dep. 162:19–163:1.

### B. Engelhardt's Return to CenturyLink as an Independent Contractor in 2011

In 2011, Engelhardt learned that CenturyLink was seeking contractor technicians. Id.

21:7–8. CenturyLink uses contractor technicians from early April until mid-October to keep pace with the seasonal increase in workload. Buchholz Dep. 43:2–14. Engelhardt applied to and was hired by MP Nexlevel, LLC ("MP Nexlevel"), a company that supplies independent contractors to CenturyLink and other telecommunications companies. Engelhardt Dep. at 12:21–23; Conley Decl. [Docket No. 21] Ex. 4. The Master Agreement between CenturyLink and Nexlevel specifies that the personnel supplied by Nexlevel "are independent contractors for all purposes and at all times" and "are not employees or joint employees of CenturyLink." Conley Decl. Ex. 4 ¶ K.

MP Nexlevel initially assigned Engelhardt to work for a telecommunications company in Big Lake, Minnesota, but agreed to transfer him to CenturyLink because Engelhardt wanted to work in to St. Paul. Engelhardt Dep. 14:8–12; 25:8–11. While the transfer was pending, CenturyLink manager Chris Fry ("Fry"), who reports directly to Buchholz, sent Buchholz an email regarding Engelhardt that stated: "If we fired this field technician, how does he make it through screening and on our candidate list?" Delbridge Decl. Ex. 6. CenturyLink manager John Ardoyno ("Ardoyno") expressed a similar concern in his email to MP Nexlevel, stating: "I just found out Walt Engelhardt was terminated from Qwest a few years ago. I had no idea he used to be an employee, but we don't want him back." Id. Ex. 7. Notwithstanding Fry and Ardoyno's concerns, Engelhardt began working as an independent contractor for CenturyLink on August 25, 2011.

On his sixth day working as a CenturyLink contractor, Engelhardt was dismissed from his assignment because his name appeared on a "Do Not Rehire" list maintained by CenturyLink. Buchholz Dep. 10:1–16. Buchholz made the decision to dismiss Engelhardt,

3

understanding that the "Do Not Rehire" list was comprised of former employees who were terminated for code of conduct violations or other issues. Id. at 11:18–12:3. Buchholz was not involved in creating the "Do Not Rehire" list and did not investigate why Engelhardt's name was on it. Id. at 13:3–19. At the time Buchholz decided to release Engelhardt in August 2011, he did not know that Engelhardt had been a plaintiff in the Brennan Lawsuit. Id. at 8:18–21; 9:2–12; 11:14–17;15:15–19. Since this case was filed, Engelhardt has discovered that two other individuals on the "Do Not Rehire" list were plaintiff class members in the Brennan Lawsuit. Delbridge Decl. Exs. 14, 15, 20, 21.

On September 28, 2011, approximately four weeks after he had been dismissed from the CenturyLink assignment, Engelhardt sent Buchholz an email captioned "Retaliation." Attached to the email was a letter written by Engelhardt to Buchholz. Deblridge Decl. Ex. 4. In the letter, Engelhardt questioned whether Ardoyno's email stating "we do not want him back" was the beginning of retaliation against Engelhardt Id. at 1. The letter also stated that any policy by CenturyLink to refuse to rehire technicians who had been fired for QJD "can only be viewed as retaliation" because the policy would only affect plaintiffs in the Brennan Lawsuit. Id. at 2. Engelhardt concluded the letter by informing Buchholz that he had contacted an attorney and stating that he hoped Buchholz would "resolve this problem and keep it from being a legal battle." Id. Buchholz replied to Engelhardt's email approximately two hours later and told Engelhardt he would look into the matter and get back to him the following week. Id. Ex. 12.

On the evening of Friday, October 14, 2011, Buchholz called Engelhardt and informed him that he would be approved to return as a contractor for CenturyLink. Id. Ex. 13; Engelhardt Dep. 15:24–16:4, 54:14–18. Early the following Monday, October 17, Engelhardt received an

email apparently intended for MP Nexlevel employee Todd Wolff from Jeff Bedard ("Bedard") of MP Nexlevel. Delbridge Decl. Ex. 16. The email stated: "Todd, [CenturyLink employee] Rich [Nelson] told me on Friday that he or anyone else at Century Link will have no contact with Walt." Id. Nevertheless, Bedard confirmed with Engelhardt on Wednesday, October 19, that "[e]verything is in and ready" for his placement at CenturyLink and that "we just need the ok to bring on another tech." Conley Suppl. Decl. [Docket No. 30] Ex. 4.

At the time Engelhardt was approved to return, CenturyLink was experiencing a seasonal decline in business and was no longer in need of additional contractors. Engelhardt Dep. 53:15–54:6, 55:2–4; Buchholz Dep. 74:5–18, 75:1–15. Thus, although Engelhardt had been approved to come back to CenturyLink on October 14, 2011, he did not return because he was told there was no work for him or any other contractors. Engelhardt Dep. 34:18–36:7. On November 1, 2011, CenturyLink eliminated all of its technician contractors. Id. at 53:18–54:6.

In his deposition testimony, Engelhardt stated that although CenturyLink had approved his return as a contractor, he believed Buchholz "wasn't gonna let it happen" and was "not gonna put [him] to work." Id. at 54:14–23. When asked whether he had any information suggesting that Buchholz's statements in October that there was no work for him were untrue, Englehardt answered: "None whatsoever." Id. at 35:8–13. Also in his deposition, Engelhardt acknowledged that CenturyLink's business declined in the wintertime, but he surmised that Buchholz may have released all of CenturyLink's contractor technicians on November 1 to avoid bringing Engelhardt back to work. Id. at 53:18–54:10; 55:6–7. When asked if he had any reason to dispute that Buchholz released the contractors because business had declined, Engelhardt replied: "Just conjecture." Id. at 53:18–54:1.

5

In 2012, Engelhardt left his employment with MP Nexlevel and moved to North Dakota.

**C. Engelhardt's Return to CenturyLink as an Independent Contractor in 2015**

Years later, in July 2015, Engelhardt learned from his former co-worker at MP Nexlevel, contractor technician Charles Howe ("Howe"), that CenturyLink was again in need of technicians. Id. at 38:1–24. Engelhardt considered returning to St. Paul to work as a contractor for CenturyLink, but was concerned that CenturyLink may not want him back. Id. at 39:2–9. Engelhardt asked Brian Tyler ("Tyler"), his former union steward at CenturyLink, to contact CenturyLink's upper management and find out "[i]f they're mad at me." Id. at 39:6–9. Tyler contacted CenturyLink manager Fry, who told Tyler: "You tell Walt whatever happened with Qwest has got nothing to do with CenturyLink and that he's welcome to come back." Id. at 39:11–15. Engelhardt also spoke with MP Nexlevel supervisor Tedd Elliott ("Elliott"), and told him: "I'm not coming back . . . to work for you guys if CenturyLink's mad." Id at 52:20–21. Elliott responded by assuring Engelhardt that there was nothing in his previous employment file that should cause him any problems in returning as a contractor for CenturyLink. Id. at 53:2–5. Elliott also contacted Randy Carriger ("Carriger"), a CenturyLink manager who, like Fry, reports directly to Buchholz. Carriger looked into Engelhardt's records and told Elliott that there was no reason Engelhardt would be precluded from working as a CenturyLink contractor. Delbridge Decl. Ex. 2 ("Howe Dep.") 25:20–23.

Following these assurances, Engelhardt returned to Minnesota, was rehired by MP Nextlevel, and was approved as a CenturyLink contractor. Engelhardt Dep. 24:17–21. His first day of work was August 3, 2015. Id. at 41:6–8. He spent his first week digging holes to "replace pits," and began performing installation and maintenance jobs the following week. Id.

6

at 153:13–18.

During this time period, the performance of contractor technicians was tracked by Brian Burth ("Burth"), a CenturyLink Area Plant Supervisor. Delbridge Decl. Ex. 5 ("Burth Dep.") 9:12–23; 10:2–4. Although Burth was not responsible for directly supervising contractor technicians, he would monitor their performance by comparing the number of hours worked per day with the number of jobs completed, and report any issues to CenturyLink employee Rennell Schank ("Schank"). Id. at 10:7–20; 14:8–19; 18:10–20  Schank would then relay those concerns to MP Nexlevel. Id. at 10:9–13. Burth's employment with CenturyLink had started in June 2015; he did not know that Engelhardt had previously been employed by CenturyLink or that he had been involved in the Brennan Lawsuit. Id. at 71:9–10; 71:17–21; 72:9–12.

Shortly after Engelhardt began performing installations, Burth received complaints from CenturyLink's union technicians that they had to make repairs to jobs that Engelhardt had been originally assigned, and that Engelhardt had been calling them for assistance.[2] Id. at 35:19–38:14.

On August 18, 2015, nearly two weeks after Engelhardt started working, Burth sent an email to Fry, his supervisor, stating that in reviewing the prior week's work by contractors he "noticed [Engelhardt] is not contributing to the workload." Conley Decl. Ex. 6 at 2. The email listed seven dates showing the number of hours Engelhardt had worked and the number of jobs he had completed. Id. Engelhardt averaged just over three completions per day, the lowest that Burth had seen from contractors or employees. Id.; Burth Dep. 45:4–13. Burth expected

---

[2] Union technicians tend to resist calls for help from contractors because they view contractors as a threat to their jobs. Id. at 35:24–36:10.

contractors to complete the same amount of work as a CenturyLink employee: five or six jobs in a ten-hour day. Burth Dep. 19:23–20:5. Engelhardt understood that CenturyLink expected its technicians to complete 4.1 jobs per day. Engelhardt Dep. 156:3–157:14.

Burth also stated in the email that he had discussed Engelhardt's work with "Bosman," a coworker at CenturyLink, and "[Bosman] tends to agree that we should send the contractor back." Conley Decl. Ex. 6 at 2. Burth concluded the email by repeating that he did "not see him as contributing to our workload as of today." Id. At the time Burth wrote the email, CenturyLink was far behind in its workload. Burth Dep. 48:16–17; 50:12. Burth's review of Engelhardt's completion rates over the seven-day time period caused him to conclude that CenturyLink was not benefitting by having Engelhardt. Id. at 52:1–10. In addition to sending the email, Burth spoke with Fry by phone about his concerns with Engelhardt. Id. at 57:19–24.

Fry forwarded Burth's email to Schank and copied Buchholz, his supervisor, as a courtesy. Conley Decl. Ex. 6 at 1; id. Ex. 7 ("Fry Dep.") 13:19–24. In forwarding the email, Fry asked Schank to review Burth's concerns and noted that "[production levels are low, he is apparently calling our CTO technicians for assistance, returning work to himself for future dates, and working at a pace that needs to be addressed." Id. Ex. 6 at 1. Fry requested that Schank or a MP Nexlevel supervisor address the issues with Engelhardt, and asked Schank to "let us know the outcome of your investigation." Id. At the time he sent the email, Fry did not recall Engelhardt's history with CenturyLink. Fry Dep. 14:15–18.

Twenty six minutes after Fry sent the email, Buchholz replied by stating, "Send him home." Conley Decl. Ex. 6 at 1. Schank replied to Buchholz's email by stating that Engelhardt's supervisor at MP Nexlevel "will be in the office in 20 min and will send him home

8

within the hour. He hasn't dispatched for the day either." Id.

In his deposition testimony, Buchholz stated that he spent no longer than 60 seconds reading and responding to the email and did not confer with Burth or others before making the decision to send Engelhardt home. Buchholz Dep. 31:5–7. Buchholz avers that at the time of his decision, he did not recognize Engelhardt's name or remember him as being involved in the Brennan Lawsuit four years earlier. Buchholz Decl. [Docket No. 20] ¶ 4; Buchholz Dep. 23:4–17. He also avers that because the turnover rate among contractors is close to 100 percent each year, he has likely had at least 100 different contractors working under his supervision since 2011. Buchholz Decl. ¶ 4. This figure is in addition to the approximately 325 employee technicians that he regularly oversees. Buchholz Dep. 19:21–24. Buchholz further avers that in 2015, CenturyLink was struggling to keep up with its work volume and that his employees did not have time to monitor underperforming contractors. Buchholz Decl. ¶ 3. Buchholz testified in his deposition that he has made similar decisions to release technicians for low productivity after two weeks, but could not identify them by name. Buchholz Dep. 22:7–22.

**D. The Lawsuit**

On November 30, 2015, Engelhardt initiated this lawsuit in state court, alleging FLSA retaliation by CenturyLink and Buchholz, retaliation under the MWA by CenturyLink, and tortious interference with prospective business relations by Buchholz. See generally Compl. [Docket No. 1, Attach. 1].[3] The claims are premised on Engelhardt's assertion that Buchholz terminated him in 2011 and again in 2015 in retaliation for his participation in the Brennan

---

[3] Defendants subsequently removed the case to federal court pursuant to 28 U.S.C. §§ 1331, 1441(c), and 1446. Notice Removal [Docket No. 1].

9

lawsuit.

## III. DISCUSSION

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in its favor. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). To withstand a motion for summary judgment, a plaintiff "must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy." Moody v. St. Charles Cty., 23 F.3d 1410, 1412 (8th Cir. 1994) (internal quotation and alterations omitted). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. Cty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation omitted).

### B. Retaliation Under the Fair Labor Standards Act (Count I)

Engelhardt asserts a claim for FLSA retaliation against both Defendants arising out of Engelhardt's 2015 termination.

The FLSA prohibits an employer from discharging or discriminating against an employee who has filed an FLSA complaint. 29 U.S.C. § 215(a)(3). Courts apply the burden-shifting

10

framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to FLSA retaliation claims. Grey v. City of Oak Grove, Mo., 396 F.3d 1031, 1034–35 (8th Cir. 2005). The initial burden is on the plaintiff to establish a prima facie case of retaliation by showing: (1) the plaintiff participated in protected activity; (2) the defendant took an adverse employment action against the plaintiff; and (3) there was a causal connection between the protected activity and the adverse action. Id. After a prima facie case has been established, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse action. Id. If the defendant meets this burden, the burden shifts back to the plaintiff to prove that the reason advanced by the defendants is pretextual. Id.

Assuming without deciding that Engelhardt could establish a prima facie case of retaliation, Defendants have met their burden of articulating a legitimate, non-retaliatory reasons for releasing him as a contractor. The undisputed evidence establishes that Engelhardt's productivity in 2015 was the lowest that CenturyLink Plant Manager Burth had seen from a contractor or employee, and that CenturyLink's technicians were complaining that Engelhardt was calling them for assistance. Burth and another CenturyLink employee, Bosman, agreed that CenturyLink "should send the contractor back." Delbridge Ex. 17 at 2. Thus, CenturyLink has satisfied its burden of proof and the burden shifts back to Engelhardt to produce evidence that would permit a reasonable factfinder to conclude that Defendants' stated reasons for releasing him are pretextual.

In attempting to meet this burden, Engelhardt argues that Defendants' stated reason of low productivity is pretextual because no other contractor was released for low productivity after only seven days of installation and maintenance work. A plaintiff may demonstrate pretext by

11

showing that similarly situated employees who did not engage in protected activity were treated more leniently. Ebersole v. Novo Nordisk, Inc., 758 F.3d 917, 925 (8th Cir. 2014). To prove pretext under this theory, "the plaintiff's comparators must be similarly situated in all relevant respects," meaning that the comparators must have "dealt with the same supervisor, have been subject to the same standards, . . . engaged in the same conduct without any mitigating or distinguishing circumstances," or "engaged in conduct of comparable seriousness." Id. (internal quotations omitted).

Engelhardt relies on testimony from MP Nexlevel employee Howe, who stated that other contractor technicians were given longer than two weeks to prove themselves before being released for low productivity. Howe Dep. 73:22–74:21. However, there is no evidence that these unidentified contractor technicians were similarly situated to Engelhardt in the relevant respects. To the contrary, Engelhardt's productivity was the lowest Burth had seen from all contractors and employees, and Engelhardt was also calling CenturyLink's union technicians for assistance, a discouraged practice.

Engelhardt failed to identify comparators who did not participate in the Brennan lawsuit and were treated more leniently. Significantly, Defendants have presented evidence of CenturyLink employees who <u>did</u> participate in the Brennan lawsuit and were later allowed to return as both employees and contractors. Buchholz Suppl. Decl. [Docket No. 31] ¶ 3. Thus, Engelhardt has failed to produce evidence showing that his participation in the Brennan Lawsuit caused him to be treated less favorably than similarly situated employees.[4]

---

[4] Engelhardt argues that Buchholz's failure to name specific contractors who had been fired within a two-week time frame creates a fact issue regarding pretext. Pl.'s Mem. Opp'n Summ. J. [Docket No. 26] 17–18. Buchholz's inability to specifically name prior contractors

Engelhardt also argues that Defendants' justification for releasing him is pretextual because Buchholz's decision to send him home was contrary to CenturyLink's policy for addressing concerns about contractors and deviated from Buchholz's usual practice of not directly terminating contractors. A plaintiff may demonstrate pretext by showing that an employer deviated from its policies. Ebersole, 758 F.3d at 926.

Engelhardt argues that CenturyLink had a policy for addressing contractor concerns, and that this policy did not include direct involvement by Buchholz. Rather, Fry would send an email about performance concerns to Schank and request that she investigate. In this instance, when Fry forwarded Burth's email about Engelhardt to Schank, Buchholz stepped in and released Engelhardt before Schank conducted any investigation. Engelhardt contends that Buchholz's actions were contrary to CenturyLink's usual policy and procedure for releasing contractors.

Engelhardt bases his argument on deposition testimony by Fry, who purportedly testified that he could not recall another instance when Buchholz made the decision to send a contractor home. However, Engelhardt misstates Fry's testimony. Fry testified that "the contractor workforce is a revolving door," and that he does not know the circumstances under which contractors were sent home, including whether Buchholz was the person who made the determination to send them home. Fry Dep. 17:19–19:14. Thus, Engelhardt has not presented evidence of a CenturyLink policy or practice that excludes Buchholz's direct involvement in terminating contractors. Additionally, Buchholz testified that he has made the decision to

---

fired within two weeks of starting does not raise a fact issue because it is Engelhardt, not Defendants, who carries the burden of proof on the issue of pretext.

terminate other contractor technicians in the past based on low productivity or lack of motivation, thereby undermining Engelhardt's contention that Buchholz's decision to release Engelhardt was contrary to a CenturyLink policy. Buchholz Dep. 22:11–17; Buchholz Decl. ¶ 3.

Engelhardt also argues that CenturyLink deviated from its usual practices for "onboarding" him, because he was not provided with a laptop or ID badge during the two weeks he was assigned to CenturyLink. This argument fails for at least two reasons. First, Engelhardt's own witness, Howe, testified that "there's been delays at times and . . . you have to wait for the badge to come and the tech device to come." Howe Dep. 87:19–21. Thus, delay in onboarding new contractor technicians is not an unusual occurrence in CenturyLink's practice. Additionally, documentary evidence shows that as of August 4, 2015, a CenturyLink workstation login and password had been created for Engelhardt, and that CenturyLink was waiting for his ordered laptop to arrive. Buchholz Supplemental Decl. ¶ 1, Ex. 1. Because Engelhardt has failed to raise a genuine fact issue as to whether Defendants' articulated reasons for releasing him were pretextual, his FLSA claim fails.

As a final attempt to avoid summary judgment on his FLSA claim, Engelhardt argues the jury must determine Buchholz's credibility in asserting that he did not remember Engelhardt's history with CenturyLink or his involvement in the Brennan Lawsuit, a suit with over 300 plaintiffs, when Buchholz released Engelhardt in August 2015. Whether Buchholz remembered Engelhardt or not is immaterial; Defendants have produced undisputed evidence of Engelhardt's objectively poor performance as a contractor and Engelhardt has failed to produce evidence that Defendants' reasons for firing him were pretextual. Nevertheless, Engelhart's assertion that Buchholz's testimony about not remembering him from four years earlier is "incredible" is not

14

supported by the facts of record. Pl.'s Mem. Opp'n Summ. J. At 31. Buchholz oversees approximately 325 employee technicians and at least 35 contractor technicians with a nearly 100% annual contractor turnover rate. Although Engelhardt argues that he exchanged at least 8 emails with Buchholz (including one that was titled "Retaliation") and spoke with him once by phone in October 2011, the volume of contact lacks significance in the face of Buchholz's testimony that he receives roughly 225 emails per day. Buchholz Dep. 81:16. It is not "incredible" that Buchholz would not remember Engelhardt's name from four years earlier. Even when the evidence is viewed in the light most favorable Engelhardt and all justifiable inferences are drawn in his favor, a finding for Engelhardt on this issue would be based on "mere speculation, conjecture, or fantasy." Moody, 23 F.3d at 1412. "Speculation, however, is not circumstantial evidence," and does not raise a genuine issue of fact as to whether Buchholz's decision to release Engelhardt in 2015 was made in retaliation for his participation in the class action Brennan Lawsuit. Harnan v. Univ. of St. Thomas, 776 F. Supp. 2d 938, 948 (D. Minn. 2011).

## C. Claim Under Minnesota Whistleblower Act

Engelhardt claims Century Link violated the MWA by releasing him in 2011 and 2015. The MWA forbids an employer from discharging an "employee" because the employee, in good faith, reported a violation, suspected violation or planned violation of any federal or state law or common law or rule. Minn. Stat. § 181.932, subd. 1(1). The MWA defines "Employee" to mean "a person who performs services for hire in Minnesota for an employer. Employee does not include an independent contractor." Minn. Stat. § 181.931, subd. 2.

Engelhardt lacks standing to bring a claim under the MWA because he is not an

15

"employee" under the statute. Rather, he is an independent contractor, which is expressly excluded from the definition of "employee" under the MWA. Engelhardt attempts to avoid the express language of the statute by citing to Krutchen v. Zayo Bandwidth Northeast, LLC, 591 F. Supp. 2d 1002, 1013 (D. Minn. 2008). Krutchen is factually distinguishable because it did not involve a claim by an independent contractor. Thus, the language of the MWA explicitly excluding independent contractors did not have to be disregarded for the plaintiff in Krutchen could proceed with his MWA claim. Because the MWA limits its coverage to employees and expressly excludes independent contractors, Engelhardt's claim must be dismissed.

Even if Engelhardt had standing to bring a MWA claim, which he does not, the claim nevertheless fails. As with FLSA claims, a claim under the MWA is analyzed under the McDonnell Douglas framework. Cokley v. City of Ostego, 623 N.W.2d 625, 630 (Minn. App. 2001).

With respect to CenturyLink's termination of Engelhardt as a contractor in 2015, the MWA claim fails for the same reasons as the FLSA claim discussed above.

With regard to the events in 2011, Engelhardt admits that he was re-approved to work in October as a contractor for CenturyLink. Engelhardt Dep. 54:14–18.[5] Nevertheless, Engelhardt speculates that Buchholz was not going to allow him to return to work. Id. at 54:20–23.

---

[5] The email that MP Nexlevel employee Bedard inadvertently sent to Engelhardt on Monday, October 17, 2011, in which Bedard said CenturyLink's Nelson said neither he nor anyone at CenturyLink would have anything to do with Engelhardt, does not alter the admitted fact that Engelhardt had been re-approved by CenturyLink. Two days after that email was sent, Bedard sent Engelhardt an email assuring him that "[e]verything is in and ready" for his placement at CenturyLink and that "we just need the ok to bring on another tech." Conley Supp. Decl. Ex. 4. Additionally, Engelhardt has produced no evidence that Nelson was a decision maker about hiring or rejecting contractor technicians for CenturyLink.

Engelhardt acknowledges that CenturyLink's workload declines in the winter, that CenturyLink released all of its contractor technicians on November 1, 2011, and that he was told there was no work for him or any other contractors. Engelhardt Dep. 34:18–36:7; 53:15–54:6, 55:2–4; Buchholz Dep. 74:5–18, 75:1–15. Moreover, Engelhardt has provided no evidence to show that CenturyLink's legitimate, non-retaliatory reason for not putting him back to work—namely, lack of workload—is pretextual. When asked in his deposition whether he had any information suggesting that Buchholz's statements in October that there was no work for him were untrue, Engelhardt answered: "None whatsoever." Id. at 35:8–13. When asked if he had any reason to dispute Buchholz's assertion that he released the contractors because business had declined, Engelhardt replied: "Just conjecture." Id. 53:18–54:1. Because Engelhardt has failed to present sufficient evidence to raise a fact issue about whether CenturyLink's stated reason for not putting him back to work in October 2011 is pretextual, his MWA claim tied to 2011 events could not survive summary judgment even if he had standing to bring it.

**D. Tortious Interference with Prospective Business Relations (Count III)**

Engelhardt alleges Buchholz intentionally and without legal justification interfered with Engelhardt's expectation of a business relationship with CenturyLink and MP Nexlevel.

To establish a claim for tortious interference with prospective business relations, a plaintiff must prove the following five elements:

> 1) The existence of a reasonable expectation of economic advantage; 2) Defendant's knowledge of that expectation of economic advantage; 3) That defendant intentionally interfered with plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation; 4) That in the absence of the wrongful act of defendant, it is reasonably probable that plaintiff would have realized his economic advantage or

17

benefit; and 5) That plaintiff sustained damages.

Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc., 844 N.W.2d 210, 219 (Minn. 2014). Engelhardt cannot satisfy the third element because his actions were neither independently tortious nor in violation of a state or federal statute or regulation. Buchholz did not violate the FLSA or MWA, and Engelhardt offers no evidence or argument that Buchholz acted tortiously. Therefore, Engelhardt's tortious interference claim fails.

## IV. CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment [Docket No. 18] is **GRANTED**; and

2. The Amended Complaint [Docket No. 14] is **DISMISSED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

BY THE COURT:

s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: June 5, 2017.